UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

TERESA D. NABORS,

                Plaintiff,

                                        Case No. 22-cv-24-pp

    v.

CLEMENT MANOR, INC.,

                Defendant.

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DKT. NO. 17)

On January 10, 2022, the plaintiff filed a complaint against the defendant, her former employer, alleging harassment, discrimination and retaliation because of her race in violation of Title VII of the Civil Rights Act of 1964 and 42 U.S.C. §1981. Dkt. No. 1. On March 17, 2023, the defendant filed a motion for summary judgment on all claims. Dkt. No. 17. That motion has been fully briefed since May 2023. Dkt. Nos. 22, 30, 38. The court will grant the defendant's motion as to the plaintiff's discriminatory discharge and retaliation claims and deny the motion as to the remaining claims.

## I.    Background

The following facts are undisputed unless otherwise noted.

### A.    <u>The Plaintiff's Employment</u>

The defendant is a senior living facility that provides independent and assisted living services, health care and other services to elderly residents. Dkt.

No. 32 at ¶¶3–4. The plaintiff worked for the defendant from December 28, 2015 to June 7, 2016, and again from October 16, 2016 to March 16, 2020. Id. at ¶1. In 2020, the plaintiff worked as a certified nursing assistant (CNA) in the defendant's skilled nursing/health center division. Id.

Nurse Manager Trisha Atkinson was the plaintiff's supervisor while the plaintiff was a CNA on the rehab unit in the health center. Id. at ¶¶2, 12. Residents on the rehab unit are there to receive therapy prior to discharge. Id. at ¶16. Each resident had a care plan summarized on a "care card" containing information about caring for that resident, including behavioral issues, how the resident is to be transferred, what assistance the resident may need with activities of daily living, whether the resident is in therapy, whether the resident uses a walker and preferred radio or tv channels. Id. at ¶17. CNAs were expected to review the care card before entering a resident's room each time. Id.

In December 2019, Atkinson completed an annual performance review for the plaintiff in which she rated the plaintiff as meeting or exceeding the expectations of her position as a CNA. Dkt. No. 36 at ¶3. Atkinson did not rate the plaintiff as anything less than "meets expectations" for her work with the residents. Id. at ¶4. The defendant does not dispute this, but states that the written comment section of the performance review stated that the plaintiff should "[r]emember to follow the care card to ensure proper interventions are in place." Id. at ¶5.

2

B. February 7, 2020 Complaint

On February 7, 2020, the plaintiff worked on the rehab unit from 6:00 a.m. to 2:30 p.m. with two other CNAs, Lolitha Abdur Rahim Mohammad and Tiffany Jackson. Dkt. No. 32 at ¶¶20–21. That morning, the plaintiff and Mohammad spoke with Atkinson about a resident, J.G., who was making racial slurs and comments to CNAs, which the plaintiff alleges included using the n-word on multiple occasions. Id. at ¶22; Dkt. No. 36 at ¶9. The parties dispute whether this was the first time the plaintiff reported J.G.'s comments to Atkinson. Dkt. No. 32 at ¶22. The plaintiff asserts that she had been complaining to Atkinson about racial slurs throughout 2019 and that nothing was done about it. Id. Mohammad testified that she also had previously reported J.G.'s use of racial slurs. Id. The defendant states that J.G. had "mental health and developmental disability type problems" that the social services staff was trying to work with him on. Id. at ¶24. The plaintiff disputes the implication that J.G.'s health issues caused him to be confused or not understand what he was saying. Id. The plaintiff asserts that J.G. appeared to know exactly what he was saying when he would use racial slurs or would refer to the African American CNAs as "dumb," "slow," "you idiot" and "incompetent." Id.

The parties dispute how Atkinson responded to the plaintiff and Mohammad's report. The defendant asserts that Atkinson apologized and stated that if J.G. used racial slurs or other inappropriate language toward them, they should bring it to her or their unit nurse to address the situation in

3

J.G.'s care plan. Id. at ¶25. According to the plaintiff, Atkinson laughed and told them not to take the racist comments seriously because the residents did not know what they were saying half the time. Id. The plaintiff says she then asked Atkinson what the CNAs should do about the harassment and Atkinson responded, "[d]eal with it." Id. The plaintiff asserts that Atkinson never "apologized" for J.G.'s behavior or said anything to the plaintiff or Mohammad about addressing J.G.'s unacceptable behavior in his care plan. Id. The parties also dispute whether the plaintiff told Atkinson that she felt threatened by J.G. Id. at ¶26. The parties agree that the plaintiff told Atkinson that she intended to file a complaint but disagree about whether Atkinson challenged her right to do so. Id. at ¶28. The plaintiff asserts that Atkinson told her that an EEOC complaint "was not going to go anywhere." Id.

The parties also dispute whether the plaintiff refused to provide care to J.G. The defendant alleges that the plaintiff told Atkinson she would not provide care to J.G. and that other CNAs already were refusing to enter J.G.'s room or answer his call light. Id. at ¶29. The plaintiff says that she never refused to care for J.G. Id. The plaintiff also disputes that any other African American CNAs refused care for J.G. Id. at ¶30. The parties agree that refusing to provide care to a resident could meet the definition of neglect under state law and would violate the defendant's policies. Id.

After the February 7 meeting, Atkinson adjusted J.G.'s care plan to include behavior monitoring and recording the frequency of inappropriate language and racial slurs. Id. at ¶31. The care plan included notes instructing

4

CNAs to ignore or redirect J.G.'s inappropriate comments and remind him that racial slurs are not appropriate. Id. at ¶¶32–34. The care plan also directed CNAs to leave the room if J.G. continued or exhibited verbally abusive behavior. Id. at ¶36. The parties dispute whether Atkinson discussed these changes with the plaintiff or any other African American CNAs. Id. at ¶37. The defendant asserts that the social work team also approached J.G. about these issues and informed him that his behavior was not acceptable. Id. at ¶¶39–40. The plaintiff says she never was informed of these conversations. Id. J.G. was discharged from the rehab unit on February 24, 2020, and the parties agree that the plaintiff made no further complaints to Atkinson about J.G. during that time. Id. at ¶38.

Atkinson told Nursing Director Roberta Banach about the plaintiff's complaints of racial harassment and the plaintiff's stated intent to file a complaint of racial harassment with the EEOC. Dkt. No. 36 at ¶38. The plaintiff contends that Atkinson also told Director of Social Work Jeanne Aliota about the plaintiff's statements, but the defendant disputes this. Id.

C.    March 11, 2020 Complaint and Investigation

On March 11, 2020, a nurse notified Atkinson about a complaint another resident, E.L., had made regarding the plaintiff. Dkt. No. 32 at ¶41. The parties' accounts of this complaint differ significantly. According to the defendant, when Atkinson spoke with E.L. on March 11, 2020, E.L. explained that (1) on March 10, 2020 she had wanted to use a bedpan but was made to get up and use the toilet; (2) she was upset because on March 7, 2020 the plaintiff had

5

made her get up earlier than she had wanted to; and (3) that the plaintiff had transferred her alone on March 10, 2020 and had done so before, in spite of the fact that E.L.'s care plan required a two-person transfer. Id. at ¶42. The defendant alleges that E.L. was not cognitively impaired and did not have a reputation for lying or trying to get CNAs in trouble. Id. at ¶45.

The plaintiff disputes E.L.'s account of their interactions. Id. at ¶42. According to the plaintiff, E.L. initially had asked to use a bedpan but the incision on her thigh was draining and the plaintiff said it was best if she got up so the nurse could change her bandage; E.L. agreed and said, "no problem." Id. As to the second allegation, the plaintiff states that E.L. had an appointment that day for which she had to get up early. Id. The plaintiff also states that she never transferred E.L. by herself—not on March 10, 2020 or on any other day. Id. The plaintiff states that "E.L. was a large woman weighing at least 240 pounds and plaintiff was physically incapable of transferring her by herself" and that she would never violate directives in a resident's care card. Id. The plaintiff alleges that Seara Jones, who worked with her on March 10, 2020, verified that the plaintiff never transferred E.L. by herself on March 10, 2020 nor was the plaintiff in the room by herself with E.L. Id.

The plaintiff adds that there were "quite a few residents who did not like African American CNAs." Id. The plaintiff alleges that residents would use racial slurs and make statements such as, "I'm going to get so-and-so fired," referring to the African American CNAs. Id. The plaintiff states that CNAs were afraid that these residents would make false allegations to get them in trouble

6

and, for this reason, they always made sure that there were two CNAs when entering certain residents' rooms, including E.L.'s room. Id. She alleges that E.L. had a reputation for lying and trying to get African American CNAs in trouble. Id. at ¶45. She also alleges that she and CNA Mohammad heard E.L. use racial slurs on multiple occasions. Dkt. No. 36 at ¶¶10, 12.

The defendant states that the failure to follow a resident's care plan is an allegation of neglect, any report of which the defendant alleges it was required to submit to the state. Dkt. No. 32 at ¶43. The plaintiff disputes that there was a basis for an allegation of neglect because none of the nursing staff substantiated E.L.'s complaint. Id. The plaintiff argues that Jones's statement contradicts E.L.'s statement and supports the plaintiff's claim that she never transferred E.L. alone in violation of E.L.'s care plan. Id. The defendant cites a memo prepared by Atkinson after she interviewed Jones on March 13, 2020. Id. at ¶49. That memo does not state anything about whether the plaintiff transferred E.L. alone. Id. The plaintiff responds that the memo was not signed by Jones and does not accurately reflect what Jones told Atkinson during that interview.

On March 11, 2020, Atkinson contacted Banach about E.L.'s complaint and Banach began an investigation. Id. at ¶44. The defendant placed the plaintiff on paid administrative leave pending the investigation. Id. at ¶46. Banach asked Aliota to interview E.L. and other residents that the plaintiff cared for to determine whether the same thing had happened to other residents. Id. at ¶47. The plaintiff concedes that even if the defendant

7

determined that E.L.'s allegation was not true, the defendant still would be required to report the allegation to the state. Id. at ¶48.

Aliota interviewed E.L. and stated that E.L. reiterated the same complaints and details to her that E.L. had provided to Atkinson. Id. at ¶51. Aliota spoke with another resident, J.W., who stated that the plaintiff was "unpleasant, nasty and she hates [J.W.'s] guts." Id. at ¶53. J.W. also stated that the plaintiff refused to move J.W.'s bedside table when asked. Id. The plaintiff disputes this, arguing that the table incident involved a different CNA. Id. Resident M.P. told Aliota that she did not have concerns about the plaintiff's care, but that the plaintiff was "loud" and "very strong," so sometimes the plaintiff "is able to transfer [M.P.] alone." Id. at ¶55. M.P.'s care plan required a two-person transfer; the plaintiff disputes that she ever transferred M.P. alone. Id. Aliota also spoke with residents F.R., G.K., S.P. and J.K., who expressed no concerns about the plaintiff. Id. at ¶¶54, 56–58.

D.    The Plaintiff's Termination

On March 12, 2020, the plaintiff met with Aliota, Banach, Atkinson and Human Resources Coordinator Emma Paul to discuss the concerns raised by E.L., J.W. and M.P. Id. at ¶59. The plaintiff denied all E.L.'s allegations. Id. at ¶¶61–63. The plaintiff denied J.W.'s allegation about refusing to move the bedside table, stating that she didn't remember that happening. Id. at ¶65. Regarding M.P.'s statement that the plaintiff had transferred her alone, the plaintiff stated that she follows a resident's care plan and does not go into a resident's room without two people. Id. at ¶67.

8

Even though the plaintiff denied transferring E.L. and M.P. alone, because there were two competent residents who reported the same care plan violation, Banach found the reports credible. Id. at ¶70. Banach determined that the plaintiff had violated the defendant's policies and procedures three times. Id. at ¶71. After consulting with the defendant's CEO, Banach made the decision to terminate the plaintiff effective March 16, 2020. Id. That same day, Banach submitted a misconduct incident report to the Wisconsin Department of Health Services. Id. at ¶74. On July 1, 2020, the Department of Health Services determined that there was insufficient evidence to substantiate the allegations. Id. at ¶76. The plaintiff contends that there was no credible evidence that she committed any misconduct and that the defendant's allegations of resident neglect were pretextual, giving rise to an inference that the plaintiff's race, her February 7, 2020 report about J.G. and her statement that she was going to file a complaint with the EEOC were the true reasons for Banach filing the Misconduct Incident Report and terminating the plaintiff's employment. Id. at ¶77.

## II.     Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Federal Rule of Civil Procedure 56(a). "Material facts" are those that, under the applicable substantive law, "might affect the outcome of the suit." See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

9

(1986). A dispute over a material fact is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

A moving party "is 'entitled to a judgment as a matter of law'" when "the nonmoving party has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Still,

> a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.

Id. (internal quotation marks omitted).

To determine whether a genuine issue of material fact exists, the court must review the record, construing all facts in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor. See Heft v. Moore, 351 F.3d 278, 282 (7th Cir. 2003) (citing Liberty Lobby, 477 U.S. at 255). "However, [the court's] favor toward the nonmoving party does not extend to drawing inferences that are supported by only speculation or conjecture." Fitzgerald v. Santoro, 707 F.3d 725, 730 (7th Cir. 2013) (quoting Harper v. C.R. Eng., Inc., 687 F.3d 297, 306 (7th Cir. 2012)). That is, "to survive summary judgment, the non-moving party must establish some genuine issue for trial 'such that a reasonable jury could return a verdict' in her favor." Fitzgerald, 707 F.3d at 730 (quoting Makowski v. SmithAmundsen LLC, 662 F.3d 818, 822 (7th Cir. 2011)).

10

III.     **Motion for Summary Judgment (Dkt. No. 17)**

The defendant moved for summary judgment on all claims, arguing that the plaintiff was not subject to a hostile work environment and that she was terminated due to three reported care violations, not due to her race. Dkt. No. 22 at 2.

A.     Hostile Work Environment Harassment

1.     *Parties' Arguments*

The defendant argues that the plaintiff cannot establish that she suffered a hostile work environment due to J.G.'s comments. Dkt. No. 22 at 11. The defendant likens this case to E.E.O.C. v. Vill. at Hamilton Pointe LLC, Case No. 17-cv-00147, 2020 WL 13568924 (S.D. Ind. Sept. 29, 2020). Id. In Hamilton Pointe, the district court relied on two Fifth Circuit cases to determine that offensive racial comments made by cognitively impaired nursing home residents could not form the basis for a hostile work environment claim. Id. at 11–12 (quoting Hamilton Pointe, 2020 WL 13568924, at *4). The defendant asserts that "J.G. had mental health and developmental disability type problems" and that the defendant took steps to correct his behavior once the plaintiff informed Atkinson of the issue. Id. at 13. The defendant argues that "caring for a resident with a mental disability who may use racial slurs was a part of [the plaintiff's] job" and cannot establish a hostile work environment. Id.

The plaintiff responds that this case is different because J.G. and E.L. used the n-word toward her. Dkt. No. 30 at 2–3. The plaintiff argues that being subjected to serious racial slurs, even if it only occurs a few times, can be

11

enough to establish that the workplace harassment was severe. Id. at 3. She argues that she was subject to multiple instances where two different residents called her the n-word and other derogatory race-based comments. Id. The plaintiff says that unlike in the residents in Hamilton Pointe, J.G. and E.L. did not have severe mental disabilities that interfered with their ability to understand what they were saying. Id. at 3–4. She argues that Atkinson did not take her report seriously and that none of the CNAs were informed that the defendant had taken any action to address J.G.'s behavior. Id. at 4. She also argues that the defendant did not offer her a transfer to avoid being subjected to such comments and that the defendant actively discouraged her from filing an EEOC charge about the behavior. Id. at 4–5.

### 2. *Analysis*

To survive summary judgment on a racially hostile work environment claim, an employee must provide sufficient evidence that demonstrates: "(1) that the work environment was both subjectively and objectively offensive; (2) that the harassment was based on membership in a protected class; (3) that the conduct was severe or pervasive; and (4) that there is a basis for employer liability."[1] Alexander v. Casino Queen, Inc., 739 F.3d 972, 982 (7th Cir. 2014). The parties do not dispute that the residents' race-based comments were offensive or based on membership a protected class. The parties primarily

---

[1] The same framework applies to both Title VII and §1981 claims. Morgan v. SVT, LLC, 724 F.3d 990, 995 (7th Cir. 2013) (quoting McGowan v. Deere & Co., 581 F.3d 575, 579 (7th Cir. 2009) and stating that "the methods of proof and elements of [a Section 1981] case are essentially identical" to those in a Title VII case.").

12

focus on the third element: whether the residents' conduct was severe or pervasive.

In May 2024, about a year after the defendant filed its motion, the Seventh Circuit affirmed Hamilton Pointe. EEOC v. Vill. at Hamilton Pointe LLC, 102 F.4th 387 (7th Cir. 2024). The Seventh Circuit upheld the district court's ruling that Black CNAs were not subjected to a hostile work environment due to racial slurs and insults levied at them by residents of the nursing home they worked in. Id. at 417. The Seventh Circuit based its ruling on the fact that most of the comments came from residents suffering from severe mental impairments:

> [A] resident's racist statement, although still very offensive, is not entitled to the same weight as would be warranted if the same statement was made by a co-worker. This conclusion is especially true when the speaker is or could be perceived to be suffering from a medical condition.

Id. (citing Cain v. Blackwell, 246 F.3d 758, 760 (5th Cir. 2001)). The Seventh Circuit found that even though a resident's repeated use of the n-word "was certainly offensive," the comments were not severe or pervasive enough to establish a hostile work environment "given the nursing home context." Id. at 421. The court also determined that there was no basis for employer liability in a few situations where the employee did not report the offensive comments to the employer. Id. at 422.

Hamilton Pointe requires that this court view J.G.'s comments in "the nursing home context," but even so, summary judgment on this claim is premature. Although the undisputed facts show that J.G. made several racist

remarks to the plaintiff, including using the n-word toward her, the parties dispute the extent to which J.G. had "mental health and developmental disability type problems." The Seventh Circuit relied on the fact that the residents in Hamilton Pointe were suffering from "severe mental impairments" when making the racist comments. Id. at 417. Here, the defendant's proposed facts are vague, stating only that J.G. "had mental health and developmental disability type problems." Dkt. No. 32 at ¶24. The defendant makes no assertions about the severity of J.G.'s impairments. The plaintiff argues that any impairments were not so severe as to render J.G. incapable of understanding his own words. If J.G. was not suffering from a "severe mental impairment," a reasonable jury might determine that his multiple uses of the n-word and other racial insults were severe or pervasive enough to establish a hostile work environment. See Hrobowski v. Worthington Steel Co., 358 F.3d 473, 477 (7th Cir. 2004) (finding a work environment objectively hostile when the plaintiff's coworkers and supervisor used the n-word repeatedly); see also Paschall v. Tube Processing Corp., 28 F.4th 805, 815 (7th Cir. 2022) ("There may well be a situation in which the one-time use of the N-word can be found to be severe enough to warrant liability.").

The plaintiff also alleges that E.L. made racist comments to her, and the undisputed facts show that E.L. was "cognitively intact." Dkt. No. 32 at ¶¶51–52. The parties dispute whether the plaintiff ever complained about E.L.'s comments. If the plaintiff failed to do so, there would be no basis for employer liability. But whether the plaintiff reported E.L.'s comments to the defendant is

a disputed material fact that that the court cannot resolve at summary judgment.

Because a reasonable factfinder could find that J.G. and E.L.'s race-based comments were sufficiently severe or pervasive, the court will deny summary judgment on the plaintiff's hostile work environment claims.

B. <u>Discriminatory Discharge</u>

1. *Parties' Arguments*

The defendant argues that the plaintiff cannot establish that she was terminated for discriminatory reasons. Dkt. No. 22 at 13. It argues that the defendant must establish that "1. She was a member of a protected class; 2. She was meeting [the defendant's] legitimate expectations; 3. She suffered an adverse employment action; and 4. Similarly situated employees who were not members of the protected class were treated more favorably." <u>Id.</u> (citing <u>Abebe v. Health & Hosp. Corp. of Marion Cnty.</u>, 35 F.4th 601, 606 (7th Cir. 2022)). The defendant contends that the plaintiff did not identify a proper comparator—a similarly situated individual outside of the plaintiff's protected class who was treated more favorably than her. <u>Id.</u> at 14. The defendant states that Banach's investigation uncovered that the plaintiff committed three policy violations, so the plaintiff was not meeting the defendant's legitimate work expectations. <u>Id.</u> The defendant argues that even if the plaintiff established a *prima facie* case of discrimination, the policy violations were a legitimate, non-discriminatory reason to terminate her, and the plaintiff cannot prove that that reason was pretextual. <u>Id.</u> at 14–15. The defendant argues that the plaintiff

15

needed to present evidence that the defendant's stated reasons for terminating her were not true, but that she failed to do so. Id. at 15.

The plaintiff argues that she needs to present only enough circumstantial evidence from which a reasonable jury could find that the defendant discriminated against her because of her race. Dkt. No. 30 at 5 (citing Phillips v. Int'l Bhd. of Elec. Workers, Case No. 08-cv-307, 2008 WL 5423188, at *5 (W.D. Wis. Dec. 30, 2008)). The plaintiff argues that her evidence includes the suspicious timing of her termination. Id. at 5–6. She alleges that she worked for the defendant for over four years and consistently received positive annual reviews, but that one month after she complained about J.G.'s racist comments, she suddenly was placed under investigation and terminated. Id. The plaintiff argues that the defendant's reasons for terminating her are "factually baseless." Id. at 6. She disputes all E.L.'s allegations and argues that another CNA, Seara Jones, corroborated her. Id. at 6–9. She argues that the allegation that she moved M.P. alone in violation of M.P.'s care card is not supported by any evidence other than M.P.'s statement. Id. at 9–10. And the plaintiff argues that she was not working on the day J.W. alleged that she refused to assist J.W. by moving the bedside table. Id. at 10.

The plaintiff argues that when viewing together the suspicious timing and factually baseless reasons for her termination, the facts give rise to an inference that her race was a factor in her discharge. Id. at 10–11. She argues that she need not provide particular pieces of evidence, such as a comparator employee, in order to survive summary judgment. Id. at 11.

16

2. *Analysis*

At the summary judgment stage, a plaintiff making a Title VII or Section 1981 claim may use multiple approaches. She may choose to utilize the McDonnell Douglas burden-shifting framework. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802–04 (1973). A plaintiff using the McDonnell Douglas framework has the initial burden of establishing that she (1) belonged to a protected class; (2) met her employer's legitimate expectations; (3) suffered an adverse employment action; and (4) was similarly situated to other employees who were not members of the protected class and were treated better. David v. Bd. of Trs. of Cmty. Coll. Dist. No. 50, 846 F.3d 216, 225 (7th Cir. 2017). If the plaintiff satisfies that burden and proves a *prima facie* case, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action. Id. If the employer does so, the burden shifts back to the plaintiff to show that the employer's explanation is pretextual. Id.

But the Seventh Circuit has made clear that a plaintiff who eschews McDonnell Douglas can support her discrimination claim with "direct or circumstantial evidence that supports an inference of intentional discrimination." Joll v. Valparaiso Cmty. Schs. 953 F.3d 923, 929 (7th Cir. 2020) (quotation omitted). Under this approach, the court "ask[s] whether the totality of the evidence shows discrimination." Igasaki v. Ill. Dep't of Fin. & Pro. Regul., 988 F.3d 948, 958–59 (7th Cir. 2021) (citing Ortiz v. Warner Enter., Inc., 834 F.3d 760, 765 (7th Cir. 2016)). "Evidence must be considered as a whole, rather than asking whether a particular piece of evidence proves the

17

case by itself." Ortiz, 834 F.3d at 765. The plaintiff's brief states that she intends to proceed with a claim using Ortiz's "totality of the evidence" approach rather than the McDonnell Douglas burden-shifting framework.

The plaintiff vigorously disputes the truth of the complaints residents made about her care, and she presents some corroborating evidence of her position from other CNAs. But the plaintiff cannot defeat summary judgment simply by challenging the adequacy of the defendant's investigation. Kariotis v. Navistar Int'l Transp. Corp., 131 F.3d 672, 677 (7th Cir. 1997). The defendant's "investigation was the reason given for the discharge, and 'a reason honestly described but poorly founded is not a pretext.'" Id. (quoting Pollard v. Rea Magnet Wire Co., Inc., 824 F.2d 557, 559 (7th Cir. 1987)). The plaintiff needed to challenge the *honesty* of the defendant's stated reason for terminating her, not the method or results of the investigation. Brill v. Lante Corp., 119 F.3d 1266, 1273 (7th Cir. 1997) (accuracy of employer's investigation is not relevant to pretext). The plaintiff did not do so; she disputed only the factual basis of the investigation, not whether Banach, the decisionmaker, genuinely believed that the plaintiff had committed multiple policy violations. Al aka-Muhammad v. Marion Cnty. Juv. Det. Ctr., Case No. 15-cv-01495, 2017 WL 6055508, at *9 (S.D. Ind. Dec. 7, 2017) (quoting McClendon v. Ind. Sugars, Inc., 108 F.3d 789, 799 (7th Cir. 1997)) ("[I]t is not relevant whether [the employee] actually was insubordinate [or otherwise violated her employer's policies]. All that is relevant is whether [her] employer was justified in coming to that conclusion." (alterations in original)).

18

Because the plaintiff has not presented evidence that the defendant's stated reason for terminating her was pretextual, the court will grant summary judgment for the defendant on the plaintiff's discriminatory discharge claims.

C.   Retaliation

1.   *Parties' Arguments*

The defendant argues that the plaintiff cannot show that her February 7, 2020 complaint or her statement that she intended to file a complaint with the EEOC had a causal connection to her termination. Dkt. No. 22 at 16. The defendant recounts that the plaintiff relies on the fact that she was terminated just six weeks after her complaint but argues that that timing alone is not enough to create an inference of retaliation. Id. (quoting Gracia v. Sigmatron Int'l, Inc., 842 F.3d 1010, 1021 (7th Cir. 2016)). The defendant argues that it terminated the plaintiff due to the complaints residents made about her care and the associated policy violations revealed by the defendant's investigation. Id. at 16–17.

The plaintiff responds that suspicious timing is enough to establish a reasonable inference of retaliation where, as here, the defendant had not previously identified issues with the plaintiff's performance. Dkt. No. 30 at 12 (citing Walker v. Bd. of Regents of the Univ. of Wis. Sys., 300 F. Supp. 2d 836, 844–45, 848, 862–63 (W.D. Wis. 2004)). She argues that she received high marks on her performance evaluations for four years prior to March 2020. Id. She maintains that just three months prior to the investigation, the defendant had praised her performance and resident care in her annual review. Id. at 12–

19

13. The plaintiff contends that the suspicious timing of her termination shortly after her complaint of racial discrimination, combined with her previous positive performance reviews, indicate that the defendant had a retaliatory motive for her discharge. Id. at 13.

### 2. *Analysis*

Title VII prohibits an employer from retaliating against an employee "because [s]he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing." Igasaki, 988 F.3d at 959 (quoting 42 U.S.C. § 2000e-3(a)). To defeat summary judgment, the plaintiff must present evidence that "(1) [s]he engaged in an activity protected by the statute; (2) [s]he suffered an adverse employment action; and (3) there is a causal link between the protected activity and the adverse action." Lewis v. Wilkie, 909 F.3d 858, 866 (7th Cir. 2018).

The parties do not dispute that the plaintiff engaged in protected activity on February 7, 2020 when she reported J.G.'s racist statements to Atkinson and said that she intended to file a complaint with the EEOC. Nor do they dispute that the plaintiff suffered an adverse action when the defendant terminated her. The plaintiff's claim hinges on whether there is a causal link between the protected activity and the discharge. The plaintiff needed to offer evidence that a retaliatory motive was a "but-for cause of the challenged employment action." Gracia v. SigmaTron Int'l, Inc., 842 F.3d 1010, 1019 (7th Cir. 2016) (quoting Univ. of Tex. Sw Med. Ctr v. Nassar, 570 U.S. 338, 352 (2013)). "This requires proof that the unlawful retaliation would not have

occurred in the absence of the alleged wrongful action or actions of the employer." Nassar, 570 U.S. at 360. "'[R]etaliatory motive may be established through circumstantial evidence such as suspicious timing, ambiguous statements, evidence that the stated reason for the employment decision is pretextual and' other evidence from which an inference of discriminatory intent might be drawn." Gracia, 842 F.3d at 1019. "Although suspicious timing alone is rarely enough to create an inference of retaliatory motive, it can sometimes raise an inference of a causal connection, especially in combination with other evidence." Id. at 1021 (citing Magyar v. St. Joseph Reg'l Med. Ctr., 544 F.3d 766, 772 (7th Cir. 2008)).

The plaintiff asserts that her retaliation claim is based on "the suspicious timing of her termination *as well as* the pretextual reasons given for her termination, which were given on the heels of a positive performance review, all of which taken together point directly to a retaliatory motivation for her discharge." Dkt. No. 30 at 13.[2] The "pretextual" reasons to which the plaintiff refers are disputed facts—E.L.'s allegation that the plaintiff transferred E.L. by herself (which the plaintiff disputes); E.L.'s claim that the plaintiff denied her a bedpan (which the plaintiff disputes); E.L.'s claim that the plaintiff made her get up early on March 7, 2020 for no reason (which the plaintiff disputes); M.P.'s claim that the plaintiff transferred her alone (which the plaintiff

---

[2] She also challenges the factual basis for the defendant's investigation, but as discussed above, that cannot support a finding of pretext. See Castro v. DeVry Univ., Inc., 786 F.3d 559, 581 (7th Cir. 2015) (explaining that the plaintiff must "undermine the honesty" of the defendant's stated explanation to establish pretext in the retaliation context).

disputes); and J.W.'s claim that the plaintiff refused to help move her bedside table (which the plaintiff disputes). Id. at 6-11.

That leaves the combination of the suspicious timing and the positive performance reviews. The undisputed facts show that around December 26, 2019, Atkinson completed the plaintiff's annual performance review, rating the plaintiff as meeting or exceeding the expectations of her position. Dkt. No. 36 at ¶¶3-4. Atkinson wrote:

> [Plaintiff], you are incredibly knowledgeable regarding Clement Manor Procedures and are such a wonderful resource. Thank you for takin the lead and ensuring proper workflow and going above and beyond to care for your residents.
>
> Remember to follow the care card to ensure proper interventions are in place. Be cognizant of behavior and body language during uncomfortable situations. Thank you for all of the wonderful care that you provide.

Id. at ¶5. Although the parties dispute whether the plaintiff reported J.G.'s racial slurs before the performance review, they do not dispute that on February 7, 2020—six weeks later—the plaintiff reported J.G.'s conduct to Atkinson. Dkt. No. 32 at ¶22. Thirty-three days later—on March 11, 2020—a nurse notified Atkinson about E.L.'s complaints about the plaintiff (complaints that the plaintiff disputes). Id. at ¶41. Aliota began the investigation the same day, id. at ¶47, and the defendant terminated the plaintiff on March 16, 2020, id. at ¶71.

So—the plaintiff was terminated about ten weeks after a generally positive performance review, about five weeks after she reported J.G.'s racial slurs and approximately a week after Atkinson was notified of E.L.'s complaint

22

against the plaintiff. The plaintiff asserts that "the presumption of pretext based on suspicious timing of an adverse action is enhanced when the defendant had not previously expressed displeasure with plaintiff's performance." Dkt. No. 30 at 12 (citing Walker, 300 F. Supp. 2d at 844-45, 848, 862-63); Culver v. Gorman, 416 F.3d 540, 546 (7th Cir. 2005); Lang v. Ill. Dep't of Children and Family Serv., 361 F.3d 416, 418 (7th Cir. 2004)). Although the plaintiff is correct that the appellate court has said that "an employer's sudden dissatisfaction with an employee's performance after that employee engaged in a protected activity may constitute circumstantial evidence of causation," Culver, 416 F.3d at 546 (citing Lang, 361 F.3d at 419-21), that does not accurately describe the facts of this case. Unlike the defendant in Culver, the defendant here did not terminate the plaintiff seventy-two hours after her protected activity, with no intervening events. Here, the employer terminated the plaintiff five to six weeks after she reported J.G.'s conduct, but more to the point, in the wake of E.L.'s complaints and an investigation into those complaints. The event that prompted the investigation was E.L.'s complaint, which was reported to the defendant weeks after both the positive performance review and the plaintiff's report of J.G.'s conduct. Although the plaintiff disputes E.L.'s claims, under these circumstances the "suspicious timing" and the prior positive performance reviews combined are not enough to show a causal link between her report of J.G.'s conduct and her termination.

23

The court will grant summary judgment for the defendant on the plaintiff's retaliation claims.

D.  <u>Punitive Damages</u>

1.  *Parties' Arguments*

The defendant argues that the plaintiff has not established that the defendant acted with malice or reckless indifference for the plaintiff's rights under Title VII and §1981 to justify an award of punitive damages. Dkt. No. 22 at 17. The defendant contends that it acted swiftly to address the plaintiff's complaint about J.G., initiating behavior monitoring and sending the social work team to discuss the racist comments with J.G. <u>Id.</u> at 18. Further, the defendant says that it completed an independent investigation of the residents' complaints about the plaintiff's care and determined that she had violated company policy. <u>Id.</u> The defendant argues that it had an independent legal duty to investigate and report complaints of possible abuse and neglect. <u>Id.</u>

The plaintiff asserts that the defendant failed to respond to complaints about Title VII violations despite knowing its legal obligation to investigate. Dkt. No. 30 at 14. The plaintiff argues that the defendant also attempted to "chill" the plaintiff's right to file an EEOC charge by telling her it would go nowhere. <u>Id.</u> at 14–15. She argues that the issue of punitive damages should go to trial, where the defendant would bear the burden of showing that it engaged in good faith efforts to implement an antidiscrimination policy. <u>Id.</u> at 15.

24

2.    *Analysis*

Because the court is dismissing the plaintiff's discrimination and retaliation claims arising out of her termination, the court need address only whether the plaintiff can seek punitive damages for her hostile work environment claim. "Punitive damages are available under Title VII when a plaintiff demonstrates that the defendant engaged in intentional discrimination 'with malice or with reckless indifference to the federally protected rights of an aggrieved individual.'" EEOC v. Mgmt. Hosp. of Racine, Inc., 666 F.3d 422, 437–38 (7th Cir. 2012) (quoting 42 U.S.C. §1981a(b)(1)). The plaintiff must show that "(1) the employer acted with the requisite mental state—i.e., that it acted 'in the face of a perceived risk that its actions [would] violate the federal law'; and (2) the employer's managerial agent recklessly disregarded the plaintiff's federally protected rights while acting within the scope of employment." Id. at 438 (quoting Kolstad v. Am. Dental Ass'n, 527 U.S. 526, 535–36, 543 (1999)). The burden then shifts to the employer to "show that it engaged in good faith efforts to implement an anti-discrimination policy." Id. (citing Kolstad, 527 U.S. at 545).

The undisputed facts show that Atkinson took steps to address J.G.'s racist comments on the same day that the plaintiff reported them to her. But the plaintiff asserts that the defendant failed to respond to her prior complaints about Title VII violations. The parties dispute whether the plaintiff ever made any prior complaints. The court cannot resolve that dispute on summary judgment. If the plaintiff indeed complained about residents using racial slurs

25

toward her and the defendant did not respond, a reasonable jury could find that the defendant acted with reckless indifference towards the plaintiff's rights.

The court will deny summary judgment on the plaintiff's punitive damages claim.

## IV. Conclusion

The court **GRANTS** the defendant's motion for summary judgment as to the plaintiff's third, fourth, fifth and sixth causes of action; those causes of action are **DISMISSED WITH PREJUDICE**. The court **DENIES** the defendant's motion for summary judgment as to the plaintiff's first and second causes of action and her punitive damages claim.  Dkt. No. 17.

The court will issue a separate order setting a status conference with the parties to discuss the next steps in this case.

Dated in Milwaukee, Wisconsin this 12th day of March, 2025.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**Chief United States District Judge**